**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
-------------------------------------------------------x
STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY,

      Plaintiff,

v.

                                 **DEMAND FOR JURY TRIAL**

MICHAEL ANGELO,
ORTHOPEDIC, P.C.,
MUHAMMAD S. AWAISI, M.D.,
SAM HAKKI, M.D.,
REESE J. JAMES, D.O.,
CHITRA SINHA, M.D.,
MERCYLAND HEALTH SERVICES, P.L.L.C.,
US HEALTH PHARMACEUTICALS D/B/A MEDS DIRECT, and
TOX TESTING INC.,


      Defendants.
-------------------------------------------------------x

## <u>COMPLAINT</u>

      State Farm Mutual Automobile Insurance Company ("State Farm Mutual"),

for its complaint against defendants Michael Angelo ("Angelo"), Orthopedic P.C.

("Orthopedic P.C."), Muhammad S. Awaisi, M.D. ("Awaisi"), Sam Hakki, M.D.

("Hakki"), Reese J. James, D.O. ("James"), Chitra Sinha, M.D. ("Sinha"),

Mercyland Health Services, P.L.L.C. ("Mercyland"), US Health Pharmaceuticals

d/b/a Meds Direct ("Meds Direct") and Tox Testing Inc. ("Tox Testing"),

(collectively "Defendants"), alleges as follows:

## I.    NATURE OF THE ACTION

1.    This action involves Defendants' scheme to fraudulently obtain money from State Farm Mutual by submitting, or causing to be submitted, bills and supporting documentation for services purportedly rendered to individuals ("patients") who have been in automobile accidents and are eligible for personal injury protection benefits ("No-Fault Benefits") under State Farm Mutual policies when, in fact, the services are either not performed or are performed regardless of whether they may be medically necessary.  Instead, the services, if performed at all, are performed pursuant to a predetermined protocol that enriches the Defendants, without regard to whether the services may actually be necessary to address the unique needs of any patient.

2.    Each Defendant has a critical role in the scheme.  As explained below, Angelo is the primary driver of the scheme, and he relies upon the remaining Defendants to play critical roles that are necessary to carry on and maximize the profitability of the scheme.

3.    Since at least 1991, Angelo has owned, controlled, and operated several marketing ventures that target people in automobile accidents and solicit them on behalf of personal injury attorneys and medical practices.  To support his marketing and solicitation ventures, Angelo has operated several 800 numbers, including  1-800-US-Lawyers,  1-800-US-Health,  and  1-800-PAIN-800,  that

advertise through billboards and video commercials to reach potential patients who have been involved in automobile accidents.  Angelo has also employed "marketers" and runners to directly solicit accident victims, who have been identified through, among other things, the purchase of police reports.

4.      Over time, Angelo has added to the potential profits he could make by secretly owning and operating the medical practices to whom he referred patients, as well as other companies that could bill for services provided to those patients such as pharmacies and toxicology testing companies.

5.      Thus, in 2008, Angelo purchased Greater Lakes Ambulatory Surgical Center, L.L.C. ("GLASC"), an ambulatory surgical center located in Clinton Township, Michigan.  More recently, Angelo formed a pharmacy, Meds Direct, and a toxicology screening company, Tox Testing, both of which operate from GLASC.

6.      As described further below, Angelo secretly controls medical practices that share suite space at GLASC as part of *quid pro quo* arrangements in which he provides patients to these practices in exchange for the providers referring patients to entities which he owns or controls, for medically unnecessary services.

7.      This Complaint addresses Angelo's most recent scheme to exploit the No-Fault insurance environment in Michigan, which, as explained below, is

unique in that it provides unlimited benefits for life if all conditions of eligibility are met.

8.    Angelo's current scheme began in 2015, by which point Angelo arranged for Orthopedic P.C., and, later, its successor, Mercyland, to operate from an office suite located at GLASC and recruited Defendants Awaisi, Hakki, James, Sinha, and other physicians who worked at Orthopedic P.C. and/or Mercyland ("the Physicians") to participate in the fraud scheme.

9.    Specifically, the Physicians purport to legitimately examine and diagnose patients supplied by Angelo as a pretext to administer a predetermined treatment protocol (the "Predetermined Protocol") through which the Physicians: (1) prescribe medically unnecessary opioids, to enrich Angelo, who directly benefits because he owns Meds Direct which purports to dispense most of the opioids; and (2) refer patients for medically unnecessary urinary drug testing ("UDTs"), which is also done to directly benefit Angelo because virtually all such testing is done through Tox Testing, which he owns.

10.    The *quid pro quo* arrangement between Angelo and the Physicians benefits all Defendants: (a) the Physicians receive a steady stream of patients from Angelo, for whom they can bill State Farm Mutual for their examinations and other services, and (b) Angelo benefits from billing for medically unnecessary opioids and other medications, and the corresponding toxicology testing.

11.     Because the above-described services were performed, if at all, pursuant to the Predetermined Protocol that enriched the Defendants, and not because they were medically necessary to address the unique needs of each patient, the bills and supporting documentation submitted to State Farm Mutual for those services were fraudulent and State Farm Mutual did not owe the charges for those services.

12.     This action seeks a declaratory judgment that State Farm Mutual is not liable for any pending bills or bills that Defendants have submitted, and caused to be submitted, to date and through the trial of this case based upon the above-described conduct.   This action also asserts statutory claims under 18 U.S.C. §§ 1962(c) and (d) ("RICO") as well as common law claims for fraud and unjust enrichment, to recover actual damages of more than $200,000 in No-Fault Benefits paid to Defendants, plus treble damages and costs, including reasonable attorneys' fees.

13.     State Farm Mutual has not been reimbursed by the Michigan Assigned Claims Facility, the Michigan Catastrophic Claims Association, or any other source for any of the charges at issue in this case.

## II.     JURISDICTION AND VENUE

14.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 *et seq*. because they arise under the laws

of the United States.  Pursuant to 28 U.S.C. § 1367(a), this Court also has supplemental jurisdiction over the remaining claims because they are so related to the RICO claims over which it has original jurisdiction that they form part of the same case or controversy.

15.    Pursuant to 28 U.S.C. § 1332(a)(1), this Court independently has jurisdiction over all claims because the matters in controversy exceed the sum or value of $75,000, exclusive of interest and costs, and are between citizens of different states.

16.    Pursuant to 28 U.S.C. § 1391(a), venue is proper in this district because this is the jurisdiction where Defendants reside, and a substantial part of the events or omissions that gave rise to the claims occurred here.

## III.   PARTIES

### A.    Plaintiff

17.    State Farm Mutual is a citizen of Illinois.  It is a corporation organized under the laws of Illinois, with its principal place of business in Bloomington, Illinois.  At all relevant times, it was licensed in Michigan to engage in the business of insurance.

### B.    Defendants

#### 1.    The Medical Clinic Defendants

##### a)    Orthopedic P.C.

18.     On February 9, 2011, Awaisi incorporated Orthopedic P.C. as a Michigan professional corporation.  It is a citizen of Michigan.

19.     From 2013 until 2016, Orthopedic P.C.'s principal place of business was located at 16100 19 Mile Rd., Clinton Township, Michigan 48038, which is the office suite at GLASC.

20.     Awaisi has testified that Angelo does not have any ownership interest in Orthopedic P.C. and that Awaisi is the sole owner of Orthopedic P.C. However, since 2013, Angelo has secretly owned and/or controlled Orthopedic P.C.  In fact, in a September 2017 deposition, Sinha admitted that Angelo recruited her to come to Orthopedic P.C.  Additionally, while Awaisi purported to own Orthopedic P.C. and therefore be the principal provider for his own patients who treat there, when he moved his practice out of GLASC, he stopped treating patients through Orthopedic P.C. and did not take any of his patients with him. Instead, in a January 2017 deposition, Awaisi testified that he "handed over" all of his prior patients to the new medical practice operating out of GLASC in September 2016, namely Mercyland.  Moreover, Mercyland continued to use the same medical forms, sometimes with Orthopedic P.C. letterhead.

21.     Furthermore, although Awaisi has testified that Orthopedic P.C. has not operated from the office suites at GLASC since September 2016, in its 2017

7

Annual Report submitted to Michigan's Department of Licensing and Regulation, Orthopedic P.C. still listed GLASC as the address of its registered office.

22.     Despite being a "pain management practice," the bills and related documentation that Orthopedic, P.C. has submitted to State Farm Mutual indicate that the services that it provides are typically performed to benefit Angelo.

23.     Taken together, the above facts indicate that the practice of Orthopedic P.C. was in fact secretly owned and controlled by Angelo, and that Angelo even exercised control over the patients and ensured that most remained with his continuation practice, Mercyland, rather than with their treating provider, Awaisi.

24.     From approximately the summer of 2015 through September 2016, Orthopedic P.C. knowingly submitted, and caused to be submitted, bills and supporting documentation that are fraudulent for examinations performed by Awaisi, Hakki, James, Sinha, and other physicians who have worked for Orthopedic P.C.  *See* Ex. 1.  Furthermore, these examinations were not performed to legitimately diagnose and address the unique needs of any patient, but instead were performed as part of the Predetermined Protocol to support prescriptions for medically unnecessary opioids that could be billed by Meds Direct, as well as referrals for medically unnecessary UDTs billed by Tox Testing.

**b)      Mercyland**

25.    On October 25, 2016, Mohammed Ali Abraham incorporated Mercyland Health Services, P.L.L.C. as a Michigan professional limited liability corporation with its principal place of business at 16100 19 Mile Rd., Clinton Township, Michigan 48038.

26.    In a March 2017 deposition, Sinha, who performed services for Orthopedic P.C. at GLASC from 2015-2016, and then continued to perform services for Mercyland at GLASC from 2016-2017, testified that Mohammed Ali Abraham is the owner and member of Mercyland.  Because Mohammed Ali Abraham is a resident and citizen of Michigan, Mercyland is a citizen of Michigan.

27.     Although Sinha identified Mohammed Ali Abraham as the owner of Mercyland, it is secretly owned or controlled by Angelo.  Specifically, when Awaisi moved Orthopedic P.C. out of GLASC, Mercyland simply assumed responsibility for treating the same patients who had been treated by Orthopedic P.C. at the same location, GLASC, and using the same forms and the same personnel to perform the same medically unnecessary services to those patients, namely examinations, prescriptions for opioids and other medications, and UDTs.

28.    From approximately October 2016 until at least 2018, Mercyland has knowingly submitted, and caused to be submitted, bills and supporting

documentation that are fraudulent for examinations performed by Sinha and other physicians who have worked for Mercyland. *See* Ex. 2. Furthermore, these examinations were not performed to legitimately diagnose and address the unique needs of any patient, but instead were performed as part of the Predetermined Protocol to support prescriptions for medically unnecessary opioids that are billed by Meds Direct, as well as referrals for medically unnecessary UDTs billed by Tox Testing.

### 2.    The Pharmacy

29.    Meds Direct is a Nevada corporation that was incorporated using the name "US Health Pharmaceuticals."  On May 1, 2014, it filed its Application for Certificate of Authority to Transact Business or Conduct Affairs In Michigan.  Its principal place of business is at 16100 19 Mile Rd., Clinton Township, Michigan 48038.  Thus, it is a citizen of both Nevada and Michigan.

30.    On May 14, 2014, US Health Pharmaceuticals submitted a Certificate of Assumed Name to the Michigan Department of Licensing and Regulatory Affairs.   In its filing, it listed its assumed name as "Meds Direct" and identified Angelo as a member.

31.    Meds Direct submits charges for both opioids and other pharmaceuticals pursuant to referrals from the Physicians.

10

32.    From 2015 through until at least 2018, Meds Direct has knowingly submitted, and caused to be submitted, bills and supporting documentation that are fraudulent for opioids and other pharmaceuticals provided to patients of Orthopedic P.C. and Mercyland based upon referrals from the Physicians.  *See* Exs. 1 and 2.  These bills and the supporting documentation were fraudulent and were not owed because these services were not medically necessary, and were performed pursuant to the Predetermined Protocol that was developed before the patient's initial consultation at the medical office.  Thus, the services rendered were fraudulent because they were not rendered in response to the unique presenting condition of each patient, but were rendered to conform to the Predetermined Protocol without regard to the condition of each patient.

### 3.    The Toxicology Company

33.    Tox Testing Inc. is a Delaware corporation.  On August 23, 2015, it filed its Application for Certificate of Authority to Transact Business or Conduct Affairs In Michigan.  Its principal place of business is at 16100 19 Mile Rd., Clinton Township, Michigan 48038.  Thus, it is a citizen of both Delaware and Michigan.

34.    On July 1, 2016, it submitted a Certificate of Assumed Name to the Michigan Department of Licensing and Regulatory Affairs.   In its filing, it listed

its assumed name as "Paragon Diagnostics" and identified Michael Angelo as its owner.

35.    Tox Testing submits charges for both UDTs that are performed in-office by physicians working for Mercyland and Orthopedic P.C., and UDTs that are, in fact, performed by other providers, including Ameritox Ltd., a separate toxicology lab, pursuant to referrals from the Physicians.

36.    From the summer of 2015 until at least 2018, Tox Testing has knowingly submitted, and caused to be submitted, bills and supporting documentation that are fraudulent for UDTs performed for patients of Orthopedic P.C. and Mercyland based upon referrals from the Physicians.  *See* Exs. 1 and 2. These bills and the supporting documentation were fraudulent and were not owed because these services were not medically necessary, and were performed pursuant to the Predetermined Protocol that was developed before the patient's initial consultation at the medical office.   Thus, the services rendered were fraudulent because they were not rendered in response to the unique presenting condition of each patient, but were rendered to conform to the Predetermined Protocol without regard to the condition of each patient.

### 4.    The True Owner

#### a)    Michael Angelo

37.    Michael Angelo is a resident and citizen of the state of New Jersey.

38.    To facilitate his scheme, Angelo has secretly owned or controlled a network of facilities in Michigan, including Orthopedic P.C., Mercyland, GLASC, Meds Direct, and Tox Testing, targeting patients who have been in auto accidents and are eligible for No-Fault Benefits.

39.    Angelo has secretly owned and controlled Orthopedic P.C. and Mercyland to enrich himself and the other Defendants by fully exploiting the No-Fault insurance environment in Michigan by providing and billing for medically unnecessary services pursuant to the Predetermined Protocol.

40.    From at least 2015 through the present, Angelo has knowingly submitted, and caused to be submitted, fraudulent bills and supporting documentation from: (a) Orthopedic P.C. for examinations performed by Awaisi, Hakki, James, Sinha, and other physicians at Orthopedic P.C. (*see* Ex. 1); (b) Mercyland for examinations performed by Sinha and other physicians at Mercyland (*see* Ex. 2); (c) Meds Direct for opioids provided to patients of Orthopedic P.C. and Mercyland (*see* Exs. 1 and 2); and (d) Tox Testing for UDTs performed on patients of Orthopedic P.C. and Mercyland (*see* Exs. 1 and 2).

### 5.    The Physicians

#### a)    Muhammad S. Awaisi, M.D.

41.    Awaisi is a resident and citizen of the state of Michigan.

42.    Awaisi has been a licensed physician in Michigan since 2005.

43.     To conceal Angelo's control over Orthopedic P.C., Awaisi has testified that he is the sole owner of Orthopedic P.C.  As described above, Angelo in fact secretly owned and controlled Orthopedic P.C.

44.     From approximately the summer of 2015 through September 2016, Awaisi knowingly submitted, and caused to be submitted, bills and supporting documentation that are fraudulent from:  (a) Orthopedic P.C. for examinations performed on Orthopedic P.C.'s patients by Awaisi, Hakki, James, Sinha, and other physicians who have worked for Orthopedic P.C.; (b) Tox Testing for UDTs performed on Orthopedic P.C.'s patients; and (c) Meds Direct for opioids prescribed to Orthopedic P.C.'s patients.  *See* Ex. 1.

### b)     Sam Hakki, M.D.

45.     Hakki is a resident and citizen of the state of Michigan.

46.     Hakki has been a licensed physician in Michigan since 2013.

47.     From approximately the summer of 2015 through September 2016, Hakki knowingly submitted, and caused to be submitted, bills and supporting documentation that are fraudulent from:  (a) Orthopedic P.C. for examinations performed on Orthopedic P.C.'s patients by Awaisi, Hakki, James, Sinha, and other physicians who have worked for Orthopedic P.C; (b) Tox Testing for UDTs performed on Orthopedic P.C.'s patients; and (c) Meds Direct for opioids prescribed to Orthopedic P.C.'s patients.  *See* Ex. 1.

### c)    Reese James, D.O.

48.    James is a resident and citizen of the state of Michigan.

49.    Although James is a licensed physician in Michigan, his license was suspended from February 2017 until February 2018.

50.    As described further below, in February 2017, James' medical license was suspended because of his unlawful prescriptions of controlled substances.  As detailed in the Administrative Complaint upon which his suspension was based, James prescribed a large amount of commonly abused and diverted controlled substances, including opioids, between 2015 and 2016, and between June and August of 2016, James wrote an average of 87 controlled substance prescriptions, including opioids, on every workday.  James' pattern of violations included:

- Prescription of opioids without any documented rationale;

- No clear documentation of functional goals for pain management or consideration of risks and benefits of opioid therapy; and

- No documentation regarding "discrepant results" on UDTs.

51.     From approximately the summer of 2015 through September 2016, James knowingly submitted, and caused to be submitted, bills and supporting documentation that are fraudulent from: (a) Orthopedic P.C. for examinations performed on Orthopedic P.C.'s patients by Awaisi, Hakki, James, Sinha, and other physicians who have worked for Orthopedic P.C.; (b) Tox Testing for UDTs

performed on Orthopedic P.C.'s patients; and (c) Meds Direct for opioids prescribed to Orthopedic P.C.'s patients. *See* Ex. 1.

### d)    Chitra Sinha, M.D.

52.    Sinha is a resident and citizen of the state of Michigan.

53.    Sinha has been a licensed physician in Michigan since 2011.

54.    In 2014, Sinha began to treat patients in Michigan. Although her background is in obstetrics and gynecology, in Michigan, she began seeing patients for pain management.

55.    In a September 22, 2017 deposition, Sinha testified that Angelo recruited her to work at Orthopedic P.C.

56.    From approximately the summer of 2015 through September 2016, Sinha knowingly submitted, and caused to be submitted, bills and supporting documentation that are fraudulent from: (a) Orthopedic P.C. for examinations performed on Orthopedic P.C.'s patients by Awaisi, Hakki, James, Sinha, and other physicians who have worked for Orthopedic P.C.; (b) Tox Testing for UDTs performed on Orthopedic P.C.'s patients; and (c) Meds Direct for opioids prescribed to Orthopedic P.C.'s patients. *See* Ex. 1.

57.    From approximately September 2016 through February 2017, Sinha knowingly submitted, and caused to be submitted, bills and supporting documentation that are fraudulent from: (a) Mercyland for examinations

performed on Mercyland patients by Sinha and other physicians who have worked for Mercyland; (b) Tox Testing for UDTs performed on Mercyland patients; and (c) Meds Direct for opioids prescribed to Mercyland patients.  *See* Ex. 2.

## IV.   ALLEGATIONS COMMON TO ALL COUNTS

### A.   First-Party Claims for Payment Under the No-Fault Act

58.   Under Michigan's No-Fault Act, insurers are required to pay No-Fault Benefits, including "allowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery or rehabilitation," when those benefits are causally connected to an "accidental bodily injury arising out of the ownership, operation, maintenance or use of a motor vehicle."  MCL §§ 500.3105, 3107(1)(a).

59.   Michigan is the only state in the country that requires private passenger automobile insurance companies to provide unlimited No-Fault Benefits for life, if all conditions of eligibility are met.

60.   For the reasons described herein, the Defendants knew that the charges at issue in this Complaint were not for reasonably necessary medical services for an injured person's care, recovery, or rehabilitation, and therefore were not owed.

## B.    Third-Party Tort Claims for Non-Economic Loss Under the No-Fault Act

61.    Under Michigan's No-Fault Act, individuals who are not at fault for the accidents underlying their claims can also potentially recover: (a) non-economic losses, such as for pain and suffering, from the drivers who were at fault for the accident ("At-Fault Drivers") through a claim for bodily injury (a "BI Claim"), only in limited situations, including if the individual has suffered serious impairment of body function, *see* MCL § 500.3135, or (b) if recovery under the BI Claim is insufficient to fully compensate the individuals who are not at fault, from the individual's own insurance company through an uninsured or underinsured motorist claim (a "UM Claim").

62.    An individual has suffered serious impairment of body function when his or her general ability to conduct the normal course of his or her life has been affected as a result of his or her injury.  A determination of whether this has occurred requires an analysis of the totality of the circumstances, including:  (a) the nature and extent of the impairment; (b) the type and length of treatment required; (c) the duration of the impairment; (d) the extent of any residual impairment; (e) the prognosis for eventual recovery; and (f) whether there is "objective manifestation" of the injury.

63.    Defendants' scheme, including the bills and supporting documentation they have submitted, and caused to be submitted, to State Farm

Mutual were designed to exploit the patients' No-Fault Benefits, as well as to support a finding that the patients suffered serious impairments of body functions, regardless of whether they had or not, to establish the threshold for and inflate the value of potential BI and UM Claims.

### C. Legitimate Treatment of Patients with Strains, Sprains, and Radiculopathy Generally

64.     When an individual has been in an auto accident and seeks treatment for neck or back pain, a licensed professional must obtain a history and perform an examination to arrive at a legitimate diagnosis.  Based upon a legitimate diagnosis, a licensed professional must then engage in medical decision-making to design a treatment plan that is tailored to the unique needs of each patient.

65.     A sprain is a stretch and/or tear of a ligament, the fibrous band of connective tissue that joins the end of one bone with another.  Ligaments stabilize and support joints.

66.     A strain is an injury to a muscle that is caused by tears in the muscle fibers caused by overstretching.

67.     The human nervous system is composed of the brain, spinal cord, and peripheral nerves, which extend throughout the body, including the arms and legs, and into the hands and feet.  Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to transmit signals from the brain into the spinal cord

and through the peripheral nerves to initiate muscle activity throughout the body. The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves.

68.     Peripheral nerves consist of both sensory and motor nerves.  They travel throughout the body and extend from the hands and feet through the arms and legs and into the spinal cord.  The peripheral nerves come together at various specific points along the spine before traveling up the spinal cord to the brain. The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots. Damage or injury to a nerve root is called a radiculopathy and can cause various symptoms including pain, altered sensation, and loss of muscle control.

69.     Legitimate treatment plans for individuals with strains, sprains, as well as radiculopathy, may involve no treatment at all (because many of these kinds of injuries heal within weeks without any intervention), anti-inflammatories or other pain relief medications, passive modalities (such as electrical stimulation, heat, and massage, which do not require active movement by the patient), and/or active therapies (such as stretching, exercise, and muscle strengthening, which require active movement by the patient).

70.     If the above-described methods of conservative care fail, treatment may progress to other common, clinically proven and well-established pain management services such as opioids and other medications that are designed to reduce inflammation and relieve pain, as well as various forms of injections including trigger point injections, epidural injections, facet injections, and medial branch blocks targeting different pain generators.  If these fail, treatment options may include more invasive procedures, including surgery.

71.     The decision of which, if any, types of treatment are appropriate for each patient, as well as the level, frequency, and duration of the various treatments, should vary depending on the patient's unique needs, including:  (a) age and medical history; (b) physical condition, limitations, and abilities; (c) location, nature, and severity of injury and symptoms; and (d) response to treatment.

72.     Treatment plans should be periodically reassessed based upon updated histories, re-examination findings, reported pain levels, and return to functionality, and should be modified if necessary to address the patients' unique needs.  Diagnoses and treatment plans should integrate diagnostic test results.

73.     The examination, diagnosis, and treatment plan should be documented with sufficient information to support a differential diagnosis, substantiate the need for treatment, and describe the course and results of

treatment for the benefit of: (a) the licensed professionals involved in the patient's care; (b) other licensed professionals who may treat the patient; and (c) the patients themselves whose care may depend on valid documentation of this information.

74.    Patients should be discharged from treatment when they have reached maximum medical improvement, such that no further treatment is likely to benefit the patient.

75.    As set forth below, the Physicians failed to perform or document legitimate histories, exams, medical decision-making, or treatment plans.

### D.    Legitimate Prescriptions of Opioids And Use Of Urinary Drug Tests

76.    As noted above, when patients seek treatment for pain, a licensed professional must obtain a history and perform an examination to arrive at a legitimate diagnosis and, based on that diagnosis, must then engage in medical decision-making to design a legitimate treatment plan that is tailored to the unique needs of each patient.

77.    Depending on the individual patient's history, physical exam, and diagnosis, the prescription of opioids may be appropriate to alleviate pain. However, opioid pain medication presents serious risks, including addiction, overdose, and complications resulting from interactions with other drugs. Indeed, from 1999 until 2014, more than 165,000 persons have died from overdoses

related to opioid pain medication in the United States.  Over the last 15 years, Michigan, like most states, has seen a dramatic increase in opioid prescriptions, inpatient hospital stays related to opioid use, and opioid deaths.   In fact, in 2015, there were nearly 1,300 overdose deaths in Michigan, such that opioid overdose deaths outpaced the number of car crash fatalities.

78.    In light of the substantial risks posed by opioids, the Center for Disease Control has published Guidelines for Prescribing Opioids for Chronic Pain ("CDC Guidelines").  According to the CDC Guidelines, "opioids should not be considered first-line or routine therapy for chronic pain."   Moreover, "[c]linicians should consider opioid therapy only if expected benefits from both pain and function are anticipated to outweigh risks to the patient."

79.    Among other things, the CDC Guidelines instruct that before prescribing opioids, a physician must engage in a legitimate evaluation of the patients' unique circumstances, including the patient's history and symptoms, to determine whether opioid therapy is appropriate.  The CDC Guidelines further instruct that "[b]efore starting and periodically during opioid therapy, clinicians should discuss with patients known risks and realistic benefits of opioid therapy and patient and clinician responsibilities for managing therapy."   Additionally, according to the CDC Guidelines, "[w]hen opioids are started, clinicians should prescribe the lowest effective dosage."

80.     In addition to the national CDC Guidelines, to combat the ongoing epidemic related to opioid prescriptions, in 2003, the Michigan Board of Medicine and the Michigan Board of Osteopathic Medicine & Surgery adopted the "Michigan Guidelines for the Use of Controlled Substances for the Treatment of Pain" (the "Michigan Guidelines").

81.     According to the Michigan Guidelines, licensed medical providers should take certain steps to ensure that opioids are being appropriately prescribed.

82.     For example, according to the Michigan Guidelines, prior to prescribing opioids, a medical history and physical examination should be obtained, evaluated and documented in the medical record, including the nature and intensity of pain, current and past treatments for pain, underlying or coexisting diseases or conditions, the effect of the pain on physical and psychological function, history of substance abuse, and the presence of one or more recognized medical indications for the use of a controlled substance.

83.     Furthermore, according to the Michigan Guidelines, a physician prescribing opioids should formulate a treatment plan which includes objectives that will be used to determine the success of the treatment and any further diagnostic evaluations or treatments that are planned.

84.     Additionally, a physician should discuss the risks and benefits of the use of controlled substances with the patient, including the risks related to use

24

with other drugs. For example, the concurrent use of opioids with Benzodiazepines (*i.e*., Xanax, Lorazepam, *etc.*) increases a patient's risk for overdose. That is because Benzodiazepines and opioids both cause central nervous system depression and can decrease respiratory drive. Thus, if possible, medical providers should avoid prescribing opioids and Benzodiazepines concurrently. At a minimum, however, if opioids and Benzodiazepines are being concurrently prescribed, then the medical provider must communicate the risks associated with the interactions between opioids and Benzodiazepines, and should carefully monitor compliance with any prescription plan.

85. According to the Michigan Guidelines, if the patient is at a high risk for medication abuse or has a history of substance abuse, the physician should consider using a written agreement with the patient outlining the patient's responsibilities.

86. Importantly, the Michigan Guidelines instruct physicians to keep complete, current, and accurate medical records that include the following:

- The medical history and physical examination

- Diagnostic, therapeutic and laboratory results

- Evaluations and consultations

- Treatment objectives

- Discussion of risks and benefits

25

- Treatments

- Medications (including date, type, dosage and quantity prescribed)

- Periodic reviews

87.     UDTs can provide information to a medical provider that is critical in assessing whether opioid drug prescriptions, or continued opioid prescriptions, are appropriate for a particular patient.  First, UDTs can reveal that a patient is using either illicit or lawful drugs that the patient has not reported taking to the medical provider.  This is important because, as noted above, there is an increased risk for overdose when opioids are combined with non-prescribed opioids and Benzodiazepines, as well as illicit drugs like heroin and cocaine.  Second, UDTs reveal when patients are not taking opioids prescribed for them, which can indicate that the patient is diverting or illegally reselling the opioids prescribed for that patient.

88.     There are two types of UDTs that are typically used by medical providers in a clinical setting, namely a "Qualitative/Presumptive" UDT and a "Quantitative/Confirmatory" UDT.  The Qualitative/Presumptive UDT indicates whether a particular drug and/or its metabolites is present in the specimen, but does not indicate the specific concentration of that drug.  Thus, results of a Qualitative/Presumptive UDT are reported as "positive" or "negative."  By

contrast, the results of a Quantitative/Confirmatory UDT reveal the specific concentration of the metabolites of a particular drug.

89.   According to the CDC Guidelines, referrals for Quantitative/Confirmatory UDTs should be based on a particular need to detect specific opioids that cannot otherwise be identified on standard Qualitative/Presumptive UDTs or in situations where the Qualitative/Presumptive UDTs show unexpected results.

90.   The CDC Guidelines further instruct that before ordering any UDTs, medical providers "should have a plan for responding to unexpected results." Moreover, medical providers "should not test for substances for which results would not affect patient management or for which implications for patient management are unclear."

91.   As set forth below, the Physicians failed to adhere to the CDC Guidelines or the Michigan Guidelines, ordering opioids and UDTs pursuant to the Predetermined Protocol without performing legitimate exams, or engaging in legitimate decision-making and without appropriately documenting or considering the need for the opioids or UDT results.

### E.     The Background And Evolution Of The Scheme

#### 1.     Angelo Purchases GLASC And Begins Creating Medical Practices To Ensure Referrals

92.     In 2008, Angelo purchased GLASC with Dr. William Focazio ("Focazio"), a New Jersey physician.  By the time he purchased GLASC, in 2008, Angelo had already established and operated several marketing ventures in New Jersey.[1]

93.     In 2008, building on their success in New Jersey, Angelo and Focazio jointly purchased GLASC, an ambulatory surgical center.  Since 2013, after a falling out with Focazio, Angelo has been the sole owner of GLASC.

94.     Since purchasing GLASC, Angelo has established an ongoing series of medical practices at the office suite in GLASC that purport to be "pain management" clinics but were created to send patients to entities Angelo owns or controls (thereby generating revenue for Angelo.)  To keep them in operation, Angelo recruits physicians to work out of the "pain management" clinics located in the office suite at GLASC.  Angelo also relies on some of these physicians to serve as the shell-owners of the medical practices.

---

[1] Specifically, in approximately the mid-2000s, Angelo and Focazio entered into a fee-splitting agreement under which Angelo marketed and referred patients to Endo/Surgical Center of North Jersey in exchange for 50 percent of the revenue generated by Endo/Surgical Center of North Jersey from these patients.  According to a 2011 lawsuit filed by Angelo against Focazio, from 2007 until 2011, Endo/Surgical Center of North Jersey paid Angelo more than $9 million for patient referrals.

95.     The physicians recruited by Angelo to work out of the "pain management clinics" purport to provide legitimate medical evaluations for patients and, based on the evaluations, refer the patients for medically necessary services.  But these medical evaluations are not legitimate and the services are routinely prescribed without regard to whether the services may actually be necessary to address the unique needs of any patient.  Instead of legitimately evaluating the patients, these evaluations are created to maximize Angelo's profits and serve as a pretext for referring patients for services at other entities owned or controlled by Angelo.

96.     With these medical clinics in place at GLASC, Angelo relies on his marketing efforts to recruit people who had been in auto accidents to treat with the clinics.

97.     To avoid detection, Angelo periodically changes the names, owners, and tax identification numbers of the "pain management" clinics.  However, the function of the clinics remains the same: to maximize Angelo's profits by funneling patients to entities owned or controlled by Angelo.

## 2.     The Current Scheme

98.     The current scheme began when Angelo recruited Awaisi, Hakki, James, Sinha, and other physicians to purport to legitimately examine and diagnose patients supplied by Angelo as a pretext for: (1) prescribing opioids, and

29

other pharmaceuticals, which are filled by Meds Direct; and (2) referring patients for UDTs, which are billed by Tox Testing.

99.    First, beginning in 2015, physicians at Orthopedic P.C. and, later, physicians at Mercyland, included prescriptions for opioids in the Predetermined Protocol, which were not prescribed because they were medically necessary. Typically, these prescriptions are filled by Meds Direct (the pharmacy created by Angelo and located in the basement of GLASC).

100.   In addition to generating additional revenue for Angelo, the prescriptions for opioids were important to the success of the Predetermined Protocol because, as described below, they could serve as a pretext for ordering UDTs that would be billed through Tox Testing.

101.   Second, in late 2015, Angelo added referrals for medically unnecessary Urinary Drug Tests ("UDTs") to the Predetermined Protocol. This was approximately the same time that Angelo created Tox Testing, which also began operating in Michigan in 2015. Specifically, in 2015 the Physicians at Orthopedic P.C. began prescribing and performing UDTs to patients, often without even performing any medical evaluation, much less a legitimate medical evaluation that properly assessed whether a UDT was medically necessary or whether the results of the UDT were significant. Specifically, between 2015 and 2016, Tox Testing submitted charges for at least 600 UDTs purportedly performed

by the Physicians at Orthopedic P.C., even when there were no corresponding documents or charges submitted by Orthopedic P.C. for the same dates of service. By the time that Mercyland opened, the Physicians began to ensure that Mercyland patients were prescribed a Qualitative/Presumptive UDT for almost each date of service.

102. Regardless of the results of the Qualitative/Presumptive UDT, the patients' urine samples are also typically sent out for a Quantitative/Confirmatory UDT. Angelo's Tox Testing submits charges for both the Qualitative/Presumptive UDTs and Quantitative/Confirmatory UDTs, and thus directly benefits from the UDTs.

103. Because Angelo does not own a laboratory that has the more expensive equipment necessary for Quantitative/Confirmatory UDTs, Orthopedic P.C. and Mercyland send samples to other providers, including Ameritox, a large toxicology lab headquartered in Maryland, so that it can perform the Quantitative/Confirmatory UDTs. However, those providers, including Ameritox, do not bill State Farm Mutual for the UDTs performed on Orthopedic P.C. and Mercyland patients. Instead, Tox Testing submits charges for both the Qualitative/Presumptive UDTs purportedly performed at GLASC and the Quantitative/Confirmatory UDTs performed by Ameritox.

104.   Although the purported findings of the UDTs are not considered or integrated by the Physicians, Tox Testing charges more than $1,000 for each date of service for each patient.  To date, Tox Testing has submitted charges of more than $2,000,000 for UDTs for patients of Orthopedic P.C. and Mercyland.

105.   Office visits were billed through Orthopedic P.C. until about September 2016, when Angelo created Mercyland to assume the same role for Angelo that Orthopedic P.C. had filled.

106.   Mercyland is not an independent entity but, like Orthopedic P.C., is owned or controlled by Angelo.  For example, when Orthopedic P.C. purported to move to its new location at Doctor's Hospital, it did not take any patients who had been treated at its GLASC location.  Instead, Orthopedic P.C. "handed over" all of its prior patients to Mercyland.  Moreover, Sinha remained at Mercyland and Mercyland also continued to use forms with Orthopedic P.C. letterhead.

107.   At Mercyland, the Physicians continued implementing the Predetermined Protocol, which is to purport to legitimately examine and diagnose patients as a pretext for: (1) prescribing opioids, and other pharmaceuticals, which are filled by Meds Direct; and (2) referring patients for UDTs, which are billed by Tox Testing.

108.   Taken together, the above facts indicate that the practice of Mercyland was in fact secretly owned and controlled by Angelo, and that Angelo

even exercised control over the patients and ensured that most remained with his continuation practice, Mercyland.

### 3. Defendants Cultivate *Quid Pro Quo* Relationships with Personal Injury Attorneys and Solicitors to Obtain Patients

109. The economic success of Defendants' scheme depends on gaining access to a steady stream of patients, and in particular, on relationships with personal injury attorneys and "marketing" ventures that target patients who have been in auto accidents. To ensure this steady flow of patients, Angelo had spent approximately two decades building a network of marketing ventures, including several 800 numbers, including 1-800-US-Lawyer, 1-800-US-Health, and 1-800-PAIN-800, which have aggressively advertised through billboards, television, radio, and websites.

110. As part of a 2011 lawsuit against Focazio, Angelo himself submitted an affidavit attesting that "as a result of his ownership of 1-800-US-Lawyer, [he] had a relationship with many personal injury attorneys" who participated in the hotline, including attorneys in Michigan. Indeed, to maximize profits, Angelo has not only developed cross-referral relationships with personal injury attorneys, but also employed and used runners, cappers, and steerers to solicit patients and direct them to medical practices that he owns or controls.

111. According to the deposition testimony of an individual who had managed the 1-800-US Lawyer call center for several years, 1-800-US Lawyer

33

would purchase and use police reports to find potential clients and send direct mailings to the persons in the accidents.

### F.    Defendants' Fraudulent Treatment of the Patients

112.   From summer 2015 through the present, Defendants have acted in concert to carry on their scheme, with each playing different roles that are essential to the success of the scheme.   Specifically, Angelo has established, owned, or controlled GLASC, Tox Testing, Meds Direct, Orthopedic P.C., and Mercyland.   To conceal his secret control over Orthopedic P.C., Angelo used Awaisi and Abraham as paper owners of Orthopedic P.C. and Mercyland, respectively, to provide the illusion that these clinics and the Physicians were independent medical practices and practitioners.   The Physicians who have worked at Orthopedic P.C. and Mercyland have carried out the Predetermined Protocol by examining patients and, to exploit patients' No-Fault Benefits, ordering medically unnecessary opioids and UDTs.

### 1.    Defendants' Fraudulent Initial Examinations

113.   The Predetermined Protocol begins with the initial examinations, which are typically followed by re-examinations performed by the Physicians periodically over the course of treatment.   These examinations are not designed to legitimately diagnose and arrive at a treatment plan that addresses any patient's unique needs, but are done as a pretext to facilitate the Predetermined Protocol

that was developed before the patient's initial consultation at the medical office. Thus, the services rendered were fraudulent because they were not rendered in response to the unique presenting condition of each patient, but were rendered to conform to the Predetermined Protocol without regard to the condition of each patient.

114. These examinations are not designed to legitimately diagnose and arrive at a treatment plan that addresses any patient's unique needs, but are done as a pretext to facilitate the Predetermined Protocol by referring the patients for other services or treatment, including opioids and UDTs, that are provided through entities owned or controlled by Angelo, without regard for whether they are needed or not.

115. The patterns in the examinations and referrals, as well as the corresponding documentation generated by the Physicians, reveal no meaningful effort to determine whether opioid prescriptions are indicated or contraindicated, including a failure to consider or integrate the results of the UDTs into the patients' treatment plans.

116. The charts attached hereto as Exhibits 1 and 2 set forth the claims in which Defendants submitted, and caused to be submitted, to State Farm Mutual bills and supporting documentation that include fraudulent examinations,

re-examinations, UDTs, and opioids purportedly performed on Orthopedic P.C. and Mercyland patients.

117. Based upon the patterns in the examination reports, which are reflected in Exhibits 1 and 2, these examinations are not legitimate and are not intended to legitimately diagnose the patient's injuries, create an appropriate treatment plan, and/or tailor the plan to the patient's response to treatment (or lack thereof).

118. Specifically, when the documentation for the examinations and re-examinations are viewed together, patterns in the documentation show a lack of fundamental and critical physical examination information: the providers typically fail to conduct any orthopedic tests, sensory nerve tests, motor nerve tests, reflex tests, or other baseline measures that should be performed to arrive at a legitimate differential diagnosis and treatment plan, much less determinations of the appropriateness of narcotics prescriptions over substantial periods of times and other procedures.

119. Orthopedic tests, as well as sensory, motor and reflex testing, are important and basic components of physical examinations to arrive at a legitimate diagnosis and treatment plan. Furthermore, it is basic and important to document the results of these tests to establish baselines against which to measure a patient's progress or lack thereof over time and in response to various forms of treatment.

Yet, the Physicians fail to document any sensory nerve tests, motor nerve tests, reflex tests, or orthopedic tests in almost any of their examinations.

120.   For instance, the Physicians often document diagnoses of "cervical radiculopathy" or "lumbar radiculopathy," which would be caused by injuries to the sensory or motor nerve roots that are located at each level of the spine.  Yet, as noted above, their examination reports fail to document any of the standard testing that should be performed as part of any legitimate examination to arrive at these diagnoses.  Moreover, the documentation for some of these examinations does not document that the patient complained of any radicular symptoms.

121.   In addition, the Physicians routinely provide no specificity with regard to range of motion deficits patients may have in any area of the body, including any region of the spine, any joint or any limb, other than simply stating that range of motion was "decreased" in a region of the spine.  This provides no baseline for which the Physicians can monitor patient progress or lack thereof over time and in response to various forms of treatment.

122.   In short, the Physicians make no attempt to legitimately examine patients, diagnose their injuries, reach a differential diagnosis, and determine an appropriate, individually tailored treatment plan.

123.   Instead, the patterns in the examinations reveal that, if the examinations were performed at all, the outcomes were predetermined to include a

series of treatments that are engineered to maximize the revenue Angelo is able to generate from Meds Direct and Tox Testing, namely: (a) prescriptions for pharmaceuticals, including opioids; and (b) referrals for UDTs.

### 1.   Defendants' Fraudulent Opioid Prescriptions

124.   Until at least 2018, the Physicians prescribe opioids to virtually all patients at Orthopedic P.C. and Mercyland at the initial examination, or very soon thereafter, regardless of the patients' unique circumstances and a host of risk factors that should be considered before prescribing opioids.   Despite these pervasive pattern prescriptions, the Physicians do not document ***any*** analysis of whether the patient is at a risk for addiction or overdose, including whether the patient has any current or historical substance abuse issues.

125.   Additionally, the Physicians do not document any discussion regarding the risks and benefits of taking opioids, other than including the boilerplate statement "side effect discussed."   This is true even if the patient is concurrently taking Benzodiazepines, which would put the patient at an increased risk of overdose.   Specifically, as explained in the CDC Guidelines and other medical literature, the concurrent use of Benzodiazepines (like Xanax) and opioids increases the risks of a fatal overdose patient because "benzodiazepines and opioids both cause central nervous system depression and can decrease respiratory drive."   Indeed, according to the FDA, the concurrent use of

Benzodiazepines (or other central nervous system depressants) and opioids has created "nothing short of a public health crisis" leading to "a substantial increase of avoidable overdose and death." Nonetheless, the Physicians repeatedly prescribed Benzodiazepines and opioids concurrently without documenting that they discussed the specific risks and benefits of taking opioids, particularly when they are taken with Benzodiazepines.

126. For example, on February 15, 2017, Patient L.H. was first seen at Mercyland and was prescribed both Xanax (a Benzodiazepine), and Hydrocodone, as well as Cyclobenzaprine (a muscle relaxant). As noted above, the CDC Guidelines caution physicians against prescribing opioids and Benzodiazepines concurrently because taking these medications together heightens the risk of a potentially lethal overdose. On March 16, 2017, Patient L.H. returned to Mercyland for her second visit and another doctor at Mercyland once again prescribed Xanax and Hydrocodone, as well as Cyclobenzaprine. But neither the examination report from February 15, 2017 nor the examination report from March 16, 2017 reference any discussion with the patient about the increased risk of overdose that occurs when Xanax (a Benzodiazepine) and Hydrocodone are taken together.

127. The Physicians, including James and Sinha, prescribed both Xanax (a Benzodiazepine) and an opioid to other patients, such as Patients T.N. and Z.A. as

well.  As noted above, the CDC Guidelines caution physicians against prescribing opioids and Benzodiazepines concurrently because taking these medications together heightens the risk of a potentially lethal overdose.  But the examination report did not reference any discussion with the patient about the increased risk of overdose that occurs when Xanax (a Benzodiazepine) and Hydrocodone are taken together.

128.   Nor do the Physicians engage in any ongoing analysis of whether patients initially prescribed opioids should continue to receive opioids thereafter. To the contrary, the vast majority of patients continue to receive renewals for opioids throughout their course of treatment at Orthopedic P.C. and Mercyland, a course that continues often for several months.  Thus, regardless of whether the opioids prescribed are helping the patient, the Physicians continue prescribing.

129.   Moreover, as described in greater detail below, even when the toxicology testing ordered by the Physicians demonstrates potential serious concerns for continued prescriptions, such as the presence of Benzodiazepines, other opioids, and illicit drugs, or indications that the patient is not taking the prescribed opioid, the Physicians ignore these results and continue prescribing the same opioid medication, without consideration of how the treatment plan should be altered.

130.  For example, Patient K.D. received 13 examinations at Mercyland between October 25, 2016 and November 11, 2017.  He was prescribed Hydrocodone on each of the visits, even though he repeatedly tested negative for Hydrocodone and other red flags.  For example, although Patient K.D. tested positive for Barbiturates, the Physicians prescribed Patient K.D. Hydrocodone for the third time on January 21, 2017.  He was prescribed Hydrocodone again on February 18, 2017.  Although he tested negative for Hydrocodone on the report from Ameritox reported on February 21, 2017, when he returned to Mercyland on March 16, 2017, Dr. Pieh nonetheless prescribed more Hydrocodone.  Although he tested positive for Barbiturates and negative for Hydrocodone when he returned to Mercyland on April 14, 2017, he was nonetheless prescribed more Hydrocodone.  When Patient K.D. returned on May 15, 2017, for his next visit, he tested negative for Hydrocodone again.  Nonetheless, he was prescribed more Hydrocodone.  On June 16, 2017, Patient K.D. returned for his 8th visit and was once again prescribed Hydrocodone.  When he returned for another visit on July 19, 2017, he once again tested negative for Hydrocodone but was prescribed more Hydrocodone.  On August 19, 2017, Patient K.D. was seen again by Dr. Kimbrough.  He was prescribed Hydrocodone again, even though he tested negative.  Patient K.D. was prescribed Hydrocodone again on September 16, 2017, October 14, 2017, and November 11, 2017.  Although Patient K.D. tested

positive for Hydrocodone in the samples provided on September 16 and October 14, he once again tested negative on November 11.  Despite testing negative on November 11, 2017, Patient K.D. received another prescription of Hydrocodone. By November 11, 2017, Patient K.D. had tested negative for Hydrocodone at least seven times during his course of treatment.  Each of these negative results, much less seven, should have been treated as a troubling finding that demands physician attention because it suggests that the patient is not taking the prescribed opioids, and may actually be either diverting the drugs elsewhere, or hoarding opioids, which can be a risk factor for suicide.  Nonetheless, the Physicians continued prescribing Hydrocodone.

131.   In fact, the Physicians continued to prescribe Hydrocodone at each visit, even though Patient K.D. also tested positive for barbiturates on three separate occasions during the course of treatment.  Because barbiturates depress the respiratory system, concurrent use of barbiturates and opioids increases the risk of overdose and death.  But the Physicians never noted, much less took any action based upon Patient K.D.'s negative results for Hydrocodone and positive results for barbiturates, results that should have been treated as red flags.

132.   Similarly, the Physicians ignored results that should have been red flags for Patient T.N.  Specifically, on October 14, 2015, Patient T.N. was seen by James, who referred him for a UDT at Tox Testing.  Although the UDT was

positive for cocaine and morphine, James prescribed Patient T.N. both Oxycodone and Xanax (a Benzodiazepine).  Patient T.N. was seen approximately a month later, on November 5, 2015, by Hakki, who ordered another UDT that was positive for Amphetamines and morphine.  Despite these red flags, Patient T.N. received a prescription from Orthopedic P.C. for Hydrocodone.  Although each of these results should have been treated as a troubling finding that demands physician attention because it suggests that the patient is using illicit substances, neither the October 14, 2015 nor the November 5, 2015 evaluations document these findings, much less document any action based upon them.

133.   Indeed, James, one of the prescribing providers in this case, who prescribed opioids to patients at Orthopedic P.C., recently had his medical license suspended because of his opioid prescription practices.  Specifically, in February 2017,[2] the Board of Osteopathic Medicine & Surgery suspended his medical license.  In the Administrative Complaint upon which his suspension was based, James prescribed a large amount of commonly abused and diverted controlled substances between 2015 and 2016, and between June and August of 2016, James wrote an average of 87 controlled substance prescriptions on every workday.  James' pattern of violations included:

- Prescription of opioids without any documented rationale;

_____

[2] James' license was reinstated on February 24, 2018.

- No clear documentation of functional goals for pain management or consideration of risks and benefits of opioid therapy;

- No documentation regarding "discrepant results" on UDTs

134.  In addition to ignoring the results of the UDTs that were performed, the Physicians routinely order Quantitative/Confirmatory UDTs for patients whose Qualitative/Presumptive UDTs were negative for opioids or illicit substances.  As noted above, the CDC Guidelines explain that there is no medical basis for routinely ordering Quantitative/Confirmatory UDTs for patients whose Qualitative/Presumptive UDTs were negative for opioids or illicit substances. This indicates that there is no true treatment purpose for these Quantitative/Confirmatory UDTs, and that the true purpose is simply to generate more revenue for Angelo.

135.  Taken together, the opioid and toxicology prescription patterns of the Physicians, coupled with their failure to consider potential contraindications for continued opioid prescriptions, including ignoring the results of the voluminous toxicology testing they order, indicates that they are not prescribing opioids and toxicology tests for medically necessary purposes.  Instead, the prescription of these medications and these tests serves to further enrich Angelo, and at the patients' risk.

## 2. Defendants' Fraudulent Referrals For UDTs

136.  As noted above, when ordered in a legitimate setting, UDTs can provide information to a medical provider that is useful in assessing whether opioid drug use is appropriate for a particular patient.  First, UDTs can reveal that a patient is using either illicit or lawful drugs that the patient has not reported taking to the medical provider.  Second, UDTs reveal when patients are not taking opioids prescribed for them, which can indicate that the patient is diverting or illegally reselling the opioids prescribed for that patient.

137.  By contrast, the Physicians order UDTs not because they are clinically indicated for the patient or because they intend to use the results to make legitimate medical decisions for the patients, such as reassessing the patients' treatment plan or determining whether the opioids prescribed to the patients are being used or are necessary.  In fact, the Physicians: (1) order UDTs regardless of the patients' unique characteristics; (2) order Quantitative/Confirmatory UDTs regardless of the results of the Qualitative/Presumptive UDTs; and (3) routinely ignore UDT results that are red flags suggesting that the patients are at risk for substance abuse or may be diverting the opioids being prescribed.  Rather, the UDT referrals are made with such a high frequency to maximize profits for Angelo.

138.   As an initial matter, the Physicians order UDTs, which are then billed by Tox Testing, regardless of whether a UDT was appropriate for a particular patient.  Instead, referrals are made for UDTs without any consideration of the patients' individual characteristics.

139.   For example, UDTs are ordered regardless of whether the patient was taking or being prescribed opioids (or any medications that might require routine monitoring).  Specifically, the Physicians refer the vast majority of patients for UDTs.  Moreover, if a patient is referred for a UDT, the Physicians continue to refer the patient for additional UDTs at almost every subsequent visit.

140.   As noted above, not all of these patients are prescribed opioids.  For example, Patient S.H. was seen 8 times at Mercyland between October 2016 and March 2017.  He was not prescribed opioids at any of these visits.  Nonetheless, the Physicians ordered a UDT for Patient S.H. at 7 of the 8 visits, for no medical purpose.   Similarly, Patient S.K. was seen 3 times at Mercyland between April 7, 2017 and June 7, 2017.  She was not prescribed opioids at any of these visits. Nonetheless, the Physicians ordered a UDT for Patient S.K. at every visit, for no medical purpose.

141. Furthermore,        the      Physicians        routinely       order Quantitative/Confirmatory UDTs, regardless of whether the results of the Qualitative/Presumptive UDTs were positive or negative.  As noted above, the

CDC Guidelines explain that referrals for Quantitative/Confirmatory UDTs should not be routine and should be based on a particular need to detect specific opioids that cannot otherwise be identified on standard Qualitative/Presumptive UDTs or in situations where the Qualitative/Presumptive UDTs show unexpected results. By contrast, the Qualitative/Presumptive UDTs for numerous patients ordered by the Physicians revealed negative results for all of the substances being tested, meaning there was no need to obtain Quantitative/Confirmatory UDTs. Nonetheless, the Physicians routinely ordered Quantitative/Confirmatory UDTs for the Qualitative/Presumptive UDTs that were completely negative.

142.    Notably, Defendants' practice of routinely ordering both a Qualitative/Presumptive UDT and a Quantitative/Confirmatory UDT, regardless of the result of the Qualitative/Presumptive UDT, is in direct contravention of the CDC Guidelines.  Specifically, the CDC Guidelines provide that referrals for Quantitative/Confirmatory UDTs should be based on the need to detect specific opioids that cannot be identified on standard Qualitative/Presumptive UDTs or in situations where the Qualitative/Presumptive UDT shows unexpected urine drug test results.

143.    Defendants'    practice    of    routinely    ordering    both    a Qualitative/Presumptive UDT and a Quantitative/Confirmatory UDT, regardless of the result of the Qualitative/Presumptive UDT, is also in direct contravention of

the position taken by Ameritox, which was allegedly performing many of the Quantitative/Confirmatory UDTs. Specifically, in a 2012 press release, Ameritox stated that "Retesting samples screened initially by a laboratory as negative enables companies to charge additional fees for unneeded services – the process neither advances patient care nor controls taxpayer cost. Ameritox . . . does not recommend customers retest negative drug samples much less make it a standing practice to retest all negative samples."

144. But in direct contravention of the CDC Guidelines and Ameritox's position, the Physicians ordered Quantitative/Confirmatory UDTs regardless of whether the Qualitative/Presumptive UDT showed unexpected results.

145. Tellingly, when UDTs were ordered, the Physicians do not indicate why a UDT was being ordered for a particular patient. Nor do they provide any explanation of why a Quantitative/Confirmatory UDT was being ordered. In fact, many patients received both a Qualitative/Presumptive UDT and a Quantitative/Confirmatory UDT, and the Physicians do not even document that both a Qualitative/Presumptive UDT and a Quantitative/Confirmatory UDT were ordered.

146. In addition to ordering UDTs regardless of whether they were clinically indicated for a particular patient, the Physicians do not consider or factor the results of the UDTs into the patient's treatment. Such analysis would be

especially important for: (1) patients who tested negative for prescribed medications; and (2) patients who tested positive for opioids, or other lawful or unlawful drugs they were not being prescribed.

147.   Specifically, numerous patients who received UDTs had at least one UDT result that suggested that the patient was: (1) not taking the opioids being prescribed, and/or (2) taking opioids that were not being prescribed.  Yet, the Physicians almost never note that these patients had any unexpected UDT results, much less analyze and document the significance of the unexpected UDT result, which is important in determining whether the patients should continue receiving opioids.

148.   For example, Patient T.S. was seen more than 10 times by the Physicians between October 2016 and September 2017.   The Physicians prescribed Hydrocodone at seven of these visits, Oxycodone at three of these visits, and also prescribed Xanax at six of these visits.  They also ordered a UDT at ten of those visits.  But the Physicians did not note, much less take any action based upon results that should have been treated as red flags.  For example, on her first visit, Patient T.S. was seen by Sinha and tested positive for Buprenorphine, which is an opioid but can also be used to treat opioid and heroin addiction.  Sinha did not analyze whether this result suggested that Patient T.S. was at a high risk for opioid addiction or otherwise analyze the significance of the UDT result.

Instead, Sinha prescribed Hydrocodone to Patient T.S.  Similarly, when Patient T.S. tested positive for Methamphetamine on September 1, 2017, Dr. Kimbrough did not analyze whether this result suggested that Patient T.S. was at a high risk for opioid addiction or otherwise analyze the significance of the UDT result. Instead, she prescribed Percocet, Xanax, Naproxen, and Cyclobenzaprine at this visit.

149. Additionally, as noted above, while the Physicians routinely prescribed opioids, many of the patients who were being prescribed opioids tested negative for these substances.  None of the reexaminations for these patients note these unexpected red flag results, much less analyze and document their significance.  In fact, the Physicians continued prescribing opioids to patients, even when the UDTs suggested that the patients were not taking the opioids that were already prescribed.

150. For example, Patient T.H. was seen eight times by the Physicians between October 2016 and April 2017.  She received a UDT at each of those 8 visits and was prescribed opioids at 5 of those visits.  Patient T.H. was prescribed Hydrocodone at her first visit by Sinha, but when she tested negative for Hydrocodone at her next visit approximately 30 days later, Sinha did not note, much less take any action based on a result that should have been treated as a red flag.  Patient T.H. was prescribed Oxycodone by Sinha at her third visit, but when

she tested negative for Oxycodone at her next visit approximately 30 days later, Sinha did not note, much less analyze or take action based on, this unexpected result. Although she was not prescribed any opioids on her fourth visit, Patient T.H. tested positive for Hydrocodone at her fifth visit. None of the Physicians at Mercyland noted, much less attempted, to determine why Patient T.H. would be testing positive for an opioid she was not prescribed. Instead of having the significance of the UDT result assessed, Patient T.H. was prescribed Oxycodone. Although she had been prescribed Oxycodone and not Hydrocodone on her fifth visit, Patient T.H. tested positive again for Hydrocodone on the Quantitative/Confirmatory UDT for her sixth visit. Again, no Physician at Mercyland noted, much less attempted to determine why Patient T.H. would be testing positive for an opioid she was not prescribed. When Patient T.H. tested positive for Codeine and Hydrocodone at her next visit, the treating physician at Mercyland once again did not note, much less address, why Patient T.H. was testing positive for two opioids, including one that was not prescribed. And, although Patient T.H. was not prescribed more Hydrocodone on the same day that Patient T.H. tested positive for both Codeine and Hydrocodone, a Mercyland Physician wrote her another prescription for Hydrocodone just *four* days later.

151. Notably, during a March 2017 deposition, Sinha admitted that she does not consider the UDT results in determining whether a patient has been

51

taking the opioids that were prescribed. Instead, according to Sinha, if a patient tells her that they are taking the prescribed opioid, she "believe[sic] patients." Not only is this contrary to legitimate prescription practice, but it confirms that Sinha's UDT testing is not medically necessary because she ignores the results and does not incorporate them into her medical decision-making.

152. Similarly, the UDTs for numerous patients indicated that they were taking opioids that were not prescribed to them. Yet the Physicians never noted these unexpected results or took any action based upon these results.

153. In fact, some patients tested positive for both Hydrocodone and Oxycodone, two potent opioids that can be a dangerous combination because both drugs depress the respiratory system. Thus, taking them together can slow or stop breathing, which can lead to a lethal overdose. The Physicians never noted these unexpected results, much less counseled patients regarding the dangers associated with combining these substances.

154. For example, Patient S.S. began treating at Mercyland on December 22, 2016. For at least two visits, the Quantitative/Confirmatory UDT showed that Patient S.S. was concurrently using Oxycodone and Hydrocodone. Nonetheless, the Physicians did not document these unexpected results or take any other action based upon these results. Instead, in at least some instances, the Physicians prescribed Patient S.S. Hydrocodone. For example, the

Quantitative/Confirmatory UDT reported on January 26, 2017 showed that Patient S.S. was positive for both Hydrocodone and Oxycodone.  At the next visit, Dr. Kimbrough did not note this red flag result and, at the same time, prescribed Hydrocodone to Patient S.S.  Similarly, the Quantitative/Confirmatory UDT reported on March 28, 2017 showed that Patient S.S. was positive for both Hydrocodone and Oxycodone.  At the next visit, Dr. Kimbrough did not note this red flag result and, at the same time, prescribed Hydrocodone to Patient S.S.

155.   Moreover, a substantial number of patients tested positive for both opioids and Benzodiazepines.  Despite the known dangers such as increased risk of overdose associated with taking both of these substances simultaneously, the Physicians do not document any attempt to counsel these patients on the known risks or take any other action based upon these results.

156.   In short, the UDT referrals are not the product of legitimate medical decision-making and were not medically necessary because:   (a) referrals are made regardless of whether the tests are indicated; and (b) the results of the UDTs are not considered or factored into the treatment plans of the Physicians who ordered them.

### G.     State Farm Mutual's Justifiable Reliance

157.   Defendants submitted, and caused to be submitted, medical records and bills falsely representing that Orthopedic P.C., Mercyland, Meds Direct, and

Tox Testing provided services that were medically necessary when, in fact, they were not.

158. State Farm Mutual is under statutory and contractual duties to promptly pay No-Fault Benefits for medically necessary services. The bills and supporting documents that Defendants submitted, and caused to be submitted, to State Farm Mutual in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause State Farm Mutual to justifiably rely on them.

159. Defendants have made material misrepresentations and have taken other affirmative acts to conceal their fraud from State Farm Mutual. Each bill and its supporting documentation, when viewed in isolation, do not reveal their fraudulent nature. Only when the bills and supporting documentation are viewed together as a whole and over time, do the patterns emerge revealing the fraudulent nature of all the bills and supporting documentation.

160. As a result, State Farm Mutual has incurred damages of more than $200,000 in No-Fault Benefits that it paid to Defendants.

## V.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Against All Defendants)

161.    State Farm Mutual incorporates, adopts, and re-alleges as though fully set forth herein, each and every allegation in Paragraphs 1-160 above.

162.    All Defendants formed an association-in-fact "enterprise" (the "Angelo Fraudulent Billing Enterprise") as that term is defined in 18 U.S.C. § 1961(4), that engaged in, and the activities of which affected, interstate commerce.

163.    The members of the Angelo Fraudulent Billing Enterprise were joined in a common purpose, had relationships with and among each other, and associated through time sufficient to permit those associated to pursue the enterprise's common purpose, which was to defraud State Farm Mutual and other insurers through fraudulent claims for No-Fault Benefits.

164.    Each Defendant needed and depended upon the participation of the other Defendants to accomplish their common purpose of defrauding State Farm Mutual and other insurers through fraudulent claims for No-Fault Benefits. Specifically,

> (a) the Physicians, including Awaisi, Hakki, James, and Sinha, falsely purported to perform legitimate examinations and to prescribe opioids and UDTs because they were medically necessary, when, in fact, their examinations were not legitimate and these services were prescribed

to enrich Angelo through his ownership or control of Meds Direct, Tox Testing, Orthopedic P.C., and Mercyland;

(b) Awaisi served as the nominee owner of Orthopedic P.C. to conceal Angelo's true ownership and control of Orthopedic P.C.;

(c) Orthopedic P.C., Mercyland, Tox Testing, and Meds Direct served as the entities through which the Defendants purportedly performed the above-described services and submitted, and caused to be submitted, to State Farm Mutual the bills and supporting documentation for these services; and

(d) Angelo is the primary driver of the fraud scheme and has implemented it through his ownership or control of Orthopedic P.C., Mercyland, Tox Testing, Meds Direct, and GLASC.

165.   The participation and roles of each Defendant were necessary to the success of the scheme.  None of these Defendants were capable of carrying out the scheme without the participation of the others.

166.   Each Defendant has been employed by and/or associated with the Angelo Fraudulent Billing Enterprise.

167. Each Defendant has knowingly conducted and/or participated, directly or indirectly, in the conduct of the Angelo Fraudulent Billing Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of United States mail to submit to State Farm Mutual and other insurers hundreds of fraudulent claims for services that were medically unnecessary or were not performed, which are described in the RICO Events on Exhibits 1 and 2 attached

hereto.  Sample treatment records are attached hereto as Exhibits 3-6.  The false statements of material fact include that:

(a) the Physicians legitimately examined and diagnosed patients, when, in fact, they did not;

(b) the Physicians prescribed opioids and UDTs for patients because they were medically necessary to address the unique needs of each patient, when, in fact, they did not;

(c) Meds Direct filled prescriptions for opioids that were medically necessary and legitimate, when, in fact, they were not; and

(d) Tox Testing submitted charges for medically necessary UDTs, when, in fact, they were not.

168.  By reason of the above-described conduct, State Farm Mutual has been injured in its business and property in that it has paid more than $200,000 to Defendants based upon the fraudulent charges.

WHEREFORE, State Farm Mutual demands judgment against Defendants, compensatory damages, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, and any other relief the Court deems just and proper.

## SECOND CAUSE OF ACTION:
## VIOLATION OF 18 U.S.C. § 1962(d)
## <u>(Against All Defendants)</u>

169.   State Farm Mutual incorporates, adopts and re-alleges as though fully set forth herein, each and every allegation in Paragraphs 1-160 above.

170.   Defendants have knowingly agreed and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Angelo Fraudulent Billing Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mail to submit to State Farm Mutual and other insurers hundreds of fraudulent claims for services which were medically unnecessary or were not performed.

171.   The charts attached hereto as Exhibits 1-2 summarize bills that Defendants submitted, and caused to be submitted, to State Farm Mutual in furtherance of their mail fraud scheme.

172.   Defendants agreed to and acted in furtherance of the common and overall objective of the conspiracy, to defraud State Farm Mutual and other insurers, through the roles and conduct described in Paragraphs 162-167 above.

173.   By reason of the above-described conduct, State Farm Mutual has been injured in its business and property in that it has paid more than $200,000 to Defendants based upon the fraudulent charges.

WHEREFORE, State Farm Mutual demands judgment against Defendants for compensatory damages, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
### COMMON LAW FRAUD
### <u>(Against All Defendants)</u>

174.  State Farm Mutual incorporates, as though fully set forth herein, each and every allegation in Paragraphs 1-160 above.

175.  Defendants intentionally and knowingly made or caused to be made false and fraudulent statements of material fact to State Farm Mutual by submitting, and causing to be submitted, thousands of bills and related documentation for services that were either not performed, or were not performed because they were medically necessary to address the unique needs of patients.

176.  The false statements of material fact include that:

(a) the Physicians legitimately examined and diagnosed patients, when, in fact, they did not;

(b) the Physicians prescribed opioids, and UDT for patients that were medically necessary to address the unique needs of each patient, when, in fact, they did not;

(c) Meds Direct filled prescriptions for opioids that were medically necessary and legitimate, when, in fact, they were not; and

(d) Tox Testing submitted charges for medically necessary UDTs, when, in fact, they were not.

177. Defendants knew that the above-described misrepresentations made to State Farm Mutual were false and fraudulent when they were made.

178. Defendants made the above-described misrepresentations and engaged in such conduct to induce State Farm Mutual to rely on the misrepresentations.

179. As a result of its justifiable reliance on these misrepresentations, State Farm Mutual has incurred damages of more than $200,000 in No-Fault Benefits paid to Defendants.

WHEREFORE, State Farm Mutual demands judgment against Defendants for compensatory damages, costs, and other such relief as this Court deems equitable, just and proper.

## FOURTH CAUSE OF ACTION
## UNJUST ENRICHMENT
## (Against All Defendants)

180. State Farm Mutual incorporates, as though fully set forth herein, each and every allegation in Paragraphs 1-160 above.

181.   State Farm Mutual conferred a benefit upon Defendants by paying their claims and Defendants voluntarily accepted and retained the benefit of those payments.

182.   Because Defendants knowingly submitted, and caused to be submitted, to State Farm Mutual bills and supporting documentation for services that were not performed or were not performed because they were medically necessary, circumstances are such that it would be unjust and inequitable to allow Defendants to retain the benefit of the monies paid.

183.   As a direct and proximate result of the above-described conduct, State Farm Mutual has been damaged and Defendants have been unjustly enriched by more than $200,000.

WHEREFORE, State Farm Mutual demands judgment against Defendants for compensatory damages plus interest and costs and for such other relief as the Court deems equitable, just and proper.

### FIFTH CAUSE OF ACTION
### DECLARATORY JUDGMENT UNDER 28 U.S.C. § 2201
### (<u>Against Meds Direct and Tox Testing</u>)

184.   State Farm Mutual incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-160 above.

185.   This action is for declaratory relief pursuant to 28 U.S.C. § 2201.

186.   There is an actual case and controversy between State Farm Mutual, on one hand, and Meds Direct, on the other hand, as to all charges for opioids ordered by the Physicians that have not been paid.  State Farm Mutual contends that Meds Direct is not entitled to be paid for any of these unpaid claims and charges submitted to State Farm Mutual to date and through the trial of this case.

187.   There is an actual case and controversy between State Farm Mutual, on one hand, and Tox Testing, on the other hand, as to all charges for UDTs ordered by the Physicians that have not been paid.  State Farm Mutual contends that Tox Testing is not entitled to be paid for any of these unpaid claims and charges submitted to State Farm Mutual to date and through the trial of this case.

188.   Because Meds Direct and Tox Testing have knowingly made false and fraudulent statements and otherwise engaged in the above-described fraudulent conduct with the intent to conceal and misrepresent material facts and circumstances regarding each claim that each of them has submitted to State Farm Mutual, they are not entitled to any reimbursement for any unpaid claims and charges for services performed pursuant to the Predetermined Protocol submitted to State Farm Mutual to date and through the trial of this case.

WHEREFORE, State Farm Mutual respectfully requests a judgment declaring that:

(a) Meds Direct is not entitled to reimbursement for any unpaid claims and charges submitted to State Farm Mutual to date and through the

trial of this case for opioids for patients referred by the Physicians; and

(b) Tox Testing is not entitled to reimbursement for any of the unpaid claims and charges submitted to State Farm Mutual to date and through the trial of this case for UDTs for patients referred by the Physicians.

State Farm Mutual also respectfully seeks supplementary relief, attorneys' fees, interest, and costs, as this Court deems equitable, just, and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), State Farm Mutual demands a trial by jury.

Dated: March 6, 2019

By  */s/ Thomas W. Cranmer*
One of the Attorneys for State Farm Mutual Automobile Insurance Company

Thomas W. Cranmer (P25252)
Miller, Canfield, Paddock and Stone, P.L.C.
840 W. Long Lake Road
Suite 150
Troy, MI  48098
248.267.3381
cranmer@millercanfield.com

Attorney for Plaintiff State Farm Mutual Automobile Insurance Company

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on March 6, 2019, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following to all parties of record, and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participants: None.

Respectfully submitted,

By:      /s/*Thomas W. Cranmer*
Thomas W. Cranmer (P25252)
Miller, Canfield, Paddock & Stone, P.L.C.
840 W. Long Lake Road, Suite 150
Troy, MI  48098
Telephone:  248.267.3381
cranmer@millercanfield.com

*Attorneys for Plaintiff*

Dated:  March 6, 2019