**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

_____

STATE FARM MUTUAL AUTOMOBILE INSURANCE
COMPANY,

              Plaintiff,

v.                                    Case No. 19-10669

MICHAEL ANGELO,
*et al.*,

              Defendants.

_____/

**OPINION AND ORDER GRANTING PLAINTIFF'S MOTION TO ENFORCE
SETTLEMENT AGREEMENT**

      Plaintiff State Farm Mutual Automobile Insurance Company brought this action

under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §

1962(c) and (d), also asserting state law claims of fraud and unjust enrichment. (ECF

No. 1, PageID.55-63.) Plaintiff, an automobile insurance company, alleged that

Defendant Michael Angelo submitted fraudulent bills for medically unnecessary services

and prescriptions rendered to patients involved in automobile accidents. (*Id.*, PageID.2,

4, 54.)

      After extensive litigation fraught with discovery disputes, the parties entered into

a settlement agreement. (ECF No. 118, PageID.6676; ECF No. 126, PageID.7132.)

Before the court is Plaintiff's motion to enforce this settlement agreement. (ECF No.

118.) Plaintiff seeks to enforce provisions that require Defendant to dismiss ("Dismissal

Provision") or release ("Release Provision") particular categories of claims against

Plaintiff. (*Id.*, PageID.6691-97.) Plaintiff contends that Defendant is in breach of these

provisions by virtue of his role as a relator in a *qui tam* action against Plaintiff brought under the False Claims Act ("FCA").

# I. BACKGROUND

## A. Settlement Agreement

Plaintiff brought this action alleging that Defendant Michael Angelo, as the "primary driver of the scheme," and through several entities that he owns or controls, fraudulently submitted bills and supporting documentation for services purportedly rendered to patients who were involved in automobile accidents and thereby qualified for no-fault benefits under Plaintiff's policies. (ECF No. 1, PageID.2.) According to Plaintiff, these services were either not performed or were performed regardless of whether they were medically necessary. (*Id.*) Plaintiff sought compensatory damages as well as a declaratory judgment against Defendant's entities finding that Plaintiff is "not liable for any pending bills or bills that Defendants have submitted, and caused to be submitted." (*Id.*, PageID.5, 55-63.)

After litigating the case for approximately two years, the parties ultimately resolved the matter and entered into a settlement agreement on February 19, 2021. (ECF No. 118-2; ECF No. 118, PageID.6680.) Two provisions of their agreement are relevant to the present dispute. First, the agreement's Dismissal Provision provides:

> [W]ithin seven (7) days of the date this Confidential Agreement is signed, the Michael Angelo Entities shall take all steps necessary to settle, discontinue with prejudice, and to secure the discontinuance of, any lawsuits, arbitrations, appeals, claims, and other proceedings brought by any Michael Angelo Entity pending against State Farm Mutual and/or any individual insured by State Farm Mutual ("State Farm Mutual Insured"), in any forum, arising from (a) the allegations asserted or that could have been asserted in the Litigation; and/or (b) MVA Related Health Care

Services,[1] as hereinafter defined, provided by any Michael Angelo Entity(s) to any State Farm Mutual Insured on or before the Effective Date, and to waive all rights to all remedies and costs relating to such matters, including attorney's fees.

(ECF No 118-2, PageID.6704-05.) This provision also includes an indemnification clause. (*Id.*)

Second, the Release Provision states:

The Michael Angelo Entities hereby release and discharge State Farm Mutual from any and all judgments, claims, demands, losses, liabilities, costs, actions, causes of action, or suits of any kind whatsoever, whether in law or equity, known or unknown, foreseen or unforeseen, that any Michael Angelo Entity has now or may have had against State Farm Mutual, arising from (a) the allegations asserted or that could have been asserted in the Litigation; and/or (b) MVA Related Health Care Services provided by any Michael Angelo Entity(s) to any State Farm Mutual insured on or before the Effective Date. Furthermore, each Michael Angelo Entity agrees not to attempt to collect such bills submitted for benefits under personal injury protection coverage for which charges may remain due from any State Farm Mutual Insureds to whom such goods or services have been provided by Michael Angelo Entity(s).

(*Id.*, PageID.6706-07.) Like the Dismissal Provision, the Release Provision also requires Defendant to indemnify Plaintiff in the event that Defendant fails to comply. (*Id.*)

On March 4, 2021, the court entered a Stipulated Order of Dismissal dismissing Defendant from the action. (ECF No.114, PageID.6173-76.) The order also provided that the court retains jurisdiction to enforce the terms of the settlement agreement. (*Id.*, PageID.6176.)

---

1       "MVA Related Health Care Services" are defined as those relating to "any good or service related to any accidental bodily injury arising out of the ownership, operation, maintenance, or use of a motor vehicle as a motor vehicle as defined under the Michigan No-Fault Automobile Insurance Act." (ECF No. 118, PageID.6681.)

## B. The *Qui Tam* Action

On April 6, 2021, roughly six weeks after the parties entered into the settlement agreement, a *qui tam* FCA complaint ("*Qui Tam* Action") in the Eastern District of Michigan was unsealed; Defendant had filed the action as a relator, naming Plaintiff as a defendant. (ECF No. 118-3, PageID.6718-79; *United States ex rel. Michael Angelo v. State Farm Mut. Auto. Ins. Co.*, No. 19-12165, ECF No. 1.) The *Qui Tam* Action, originally filed on July 24, 2019, alleges that Plaintiff "exploited and circumvented the Medicare Secondary Payer Act, and Michigan auto insurance law—the No Fault Act—to avoid paying medical benefits to motor vehicle accident victims it insured, thus causing the government to pick up the expenses without being reimbursed by [State Farm]." (ECF No. 118-3, PageID.6719.) The complaint explains further, "[State Farm] has engaged in an elaborate and sophisticated fraudulent scheme that has caused the government to sustain significant financial loss by paying out sums of money that should have been paid by [State Farm] pertaining to motor vehicle injured victims." (ECF No. 118-3, PageID.6719.) The *Qui Tam* Action also asserts that "[State Farm] . . . knowingly presented, or caused to be presented, false or fraudulent information which causes payment or approval from the United States and/or the State of Michigan." (*Id.*) The United States and the State of Michigan declined to intervene in the lawsuit on March 9, 2021. (ECF No. 118-6.)

Plaintiff subsequently brought the present motion before the court, contending that, because Defendant filed the *Qui Tam* Action, Defendant is in breach of the parties' settlement agreement. (ECF No. 118.) Plaintiff sought, *inter alia*, an order requiring Defendant Michael Angelo to "immediately cease and desist from taking any further

4

action to prosecute the Quit Tam Lawsuit" and "take all necessary steps to secure dismissal of the Qui Tam Complaint." (*Id.*, PageID.6668.) Defendant opposed the motion on various grounds. (ECF No. 126.) Defendant explained that it would soon file an amended complaint in the *Qui Tam* Action which would demonstrate that the action falls outside of the scope of the Dismissal and Release Provisions and render Plaintiff's motion moot. (ECF No. 126, PageID.7155-56.)

Defendant filed an amended complaint in the *Qui Tam* Action that appeared substantially different from the original as it added a new relator; new *qui tam* causes of action on behalf of other states; and several new defendants, including other State Farm entities. (ECF No. 145-1.) The parties' submitted supplemental briefing to update the court on the allegations within the amended complaint. (ECF Nos. 145, 146, 147.) The parties dispute the implications of the amended complaint on Plaintiff's motion to enforce the settlement agreement, particularly as to whether the amended complaint falls within the scope of the agreement's relevant provisions.

## II. DISCUSSION

Plaintiff asks the court to declare that Defendant is in breach of the parties' settlement agreement. Plaintiff's motion turns on two questions: first, whether the *Qui Tam* Action falls within the scope of the Dismissal and/or Release Provisions, and second, if it does fall within the scope of the settlement agreement, whether the court can grant the relief that Plaintiff requests.

### A. The *Qui Tam* Action Falls Within the Scope of Settlement Agreement

Defendant first argues that the original complaint in the *Qui Tam* Action does not relate to either "allegations asserted or that could have been asserted in the Litigation"

5

or "MVA Related Health Care Services provided by any Michael Angelo Entity(s) to any

State Farm Mutual insured" and therefore falls outside the scope of the settlement

agreement, particularly because it "only pertained to Government claims." (ECF No.

126, PageID.7155.) However, the court agrees with Plaintiff that the original complaint

falls squarely within the settlement agreement. The language of the Dismissal and

Release Provisions is quite broad, encompassing any lawsuits, proceedings, claims,

actions, and "suits of any kind whatsoever . . . arising from . . . MVA Related Health

Care Services provided by any Michael Angelo Entity(s) to any [State Farm] Insured."[2]

(ECF No. 118-2, PageID.6704, 6707-8.) The original complaint clearly relates to MVA

Related Health Care Services provided by Defendant and his entities—in its

introduction, Defendant explains that the allegations against Plaintiff relate to Plaintiff

circumventing and exploiting the Michigan No Fault Act "to avoid paying medical

benefits to motor vehicle accident victims it insured, thus, causing the government to

pick up the expenses without being reimbursed by Defendant." (No. 118-3,

PageID.6719.) While the original *qui tam* complaint naturally relates to the government

recovering lost federal funds, the action arises from the Defendant's own experiences

with Plaintiff's handling of his insurance claims. For example, among the allegations of

the complaint are that Plaintiff's "insureds who are involved in accidents or car crashes

but are arbitrarily and illegally denied and/or prevented from obtaining coverage by

Defendant are then compelled to use their Medicaid/Medicare to fill prescriptions,

submit urine analyses, and/or otherwise receive reasonable and necessary medical

---

[2]    Plaintiff does not argue that Defendant could have asserted the FCA claims in
this litigation.

services from [Angelo's] Facilities." (ECF No. 118-3, PageID.6747.) As Plaintiff points out, both cases require a court to assess the propriety of treatment that Defendant or his facilities rendered to insured patients and whether the bills are legitimate. (*See id.*, PageID.6749-67 (listing patients who received treatment at Defendant's facilities and filed claims with Plaintiff).) Indeed, the original *qui tam* complaint directly refers to the present RICO action to support its FCA claims. (*Id.*, PageID.6773.) In short, the original complaint falls within the scope of the agreement.

However, Defendant argues that even if the original complaint does fall within the scope of the settlement agreement, the amended complaint is now the operative complaint. (ECF No. 146, PageID.8035.) Moreover, according to Defendant, because the amended complaint does not involve "any matter within the scope of the agreement," and instead focuses on "State Farm's nationwide fraud against the Government," the *Qui Tam* action is not subject to the Dismissal or Release Provisions. (ECF No. 126, PageID.7155.)

The court agrees with Defendant insofar as it argues that "[a]n amended complaint supersedes an earlier complaint for all purposes." *In re Refrigerant Compressors Antitrust Litig.*, 731 F.3d 586, 589 (6th Cir. 2013). Thus, there is at least some merit to Defendant's position that the court should look to only the amended complaint in determining whether there has been a breach of parties' settlement agreement. Plaintiff argues in rebuttal that the amended complaint is irrelevant because the very act of amending the complaint instead of taking steps to secure dismissal of the *Qui Tam* Action constitutes a breach of the settlement agreement—particularly because

the Dismissal Provision applies to "pending" lawsuits. (ECF No. 130, PageID.7336; ECF
No. 148, PageID.8051.)

  Even if the court accepted Defendant's position and looked only to the amended
complaint, the *Qui Tam* Action still appears to stem from allegations "arising from . .
MVA Related Health Care Services . . . provided by" Defendant and his entities.[3] (ECF
No. 118-2, PageID.6704.) Defendant contends that the "*Qui Tam* Action does not
involve any bill or claim relating to any Angelo entity." (ECF No. 146, PageID.8028.)
Defendant further argues that there are now over three hundred defendants and nine
plaintiffs, demonstrating "how totally unrelated the government's claims are to the
instant action." (ECF No. 146, PageID.8022.) But this does not change the fact that,
despite Defendant's assertions to the contrary, the amended complaint still features
claims against Plaintiff that arise from the provision of medical services to individuals
insured by Plaintiff. The amended complaint makes clear that Plaintiff had "direct
knowledge of Medicare and/or Medicaid beneficiaries that are also insureds of [State
Farm][4] or claimants [who] are entitled to coverage under Michigan law, who sought
treatment at his or other facilities, but for whom the [State Farm] refused to pay their

---

[3] Notably, in Defendant's attempt to argue that the amended complaint is the only
relevant complaint in the *Qui Tam* Action, he explains that the amended complaint
"relates back" to the original through Federal Rule of Civil Procedure 15(c)(1)(B). (ECF
No. 126, PageID.7155; ECF No. 146, PageID.8035.) The rule states that an amendment
relates back to the original when "the amendment asserts a claim or defense that *arose
out of the conduct, transaction, or occurrence set out—or attempted to be set out—in
the original pleading*." Fed. R. Civ. P. 15(c)(1)(B) (emphasis added). Defendant
therefore impliedly concedes the original and amended complaint are derived from at
least some of the same factual allegations.

[4] The amended complaint refers to the actions of "Primary Plans," which
collectively encompasses a large group of insurance companies, including State Farm.

claims." (ECF No. 145-1, PageID.7883.) Defendant cannot argue that the *Qui Tam* Action involves "beneficiaries that were not treated by any entity affiliated with Angelo" (ECF No. 146, PageID.8035), when in fact the amended complaint clarifies that "[a]s a business practice, Mr. Angelo's facilities would not turn patients away, but instead would treat them and then seek payment through other channels." (ECF No. 145-1, PageID.7884.) Although Defendant repeatedly argues that "not a single bill or claim relating to any Angelo entity, or any patient that treated at one of Angelo's entities is at issue in the Amended Complaint," the amended complaint nonetheless criticizes Plaintiff's denial of claims "submitted by Mr. Angelo." (ECF No. 146, PageID.8015.)

To be sure, the particular cause of action alleged against Plaintiff in the *Qui Tam* Action is rooted in Medicare and Medicaid fraud. However, the settlement agreement contemplates dismissal or release from *any suits* of *any kind whatsoever*, so long as it is for MVA Related Health Care Services. *Cf. United States ex rel. Radcliffe v. Purdue Pharma L.P.*, 600 F.3d 319, 328 (4th Cir. 2010) (finding that a party's FCA claim was a "legally cognizable claim subject to the terms" of a release agreement); *Watson Wyatt & Co. v. SBC Holdings, Inc.*, 513 F.3d 646, 650-52 (6th Cir. 2008) (quoting *Highlands Wellmont Health Network, Inc. v. John Deere Health Plan, Inc.*, 350 F.3d 568, 577 (6th Cir. 2003)) (explaining that where an arbitration agreement uses "broadly written" language to encompass "all claims 'arising from or in connection with . . . the services provided by'" a party, "only an express provision excluding a specific dispute," will remove the action from the scope of the agreement").

Thus, the factual allegations of the amended complaint still fall within the scope of the settlement agreement—the facts supporting Defendant's claims in the *Qui Tam*

Action "arise from" what he learned when he provided medical services to patients suffering accidental bodily injury "arising out of the ownership, operation, maintenance, or use of a motor vehicle." (ECF No. 125-1, PageID.7095.) In fact, Defendant's "exemplar" patient in the amended complaint was "insured by State Farm Group . . . [and] entitled to no-fault coverage" when he was "injured in an automobile accident." (No. 145-1, PageID.7885.) This checks all the boxes of the Dismissal and Release Provisions: an automobile accident patient, insured by Plaintiff, who is seeking no-fault coverage and receives treatment from Defendant or his entities. Defendant appears to put significant weight on the fact that his facilities "do not accept Medicare or Medicaid insurance" (*See, e.g.*, ECF No. 146, PageID.8027), but this has no bearing on whether the settlement agreement applies. The fact that the cause of action may relate to both no-fault injury claims *and* Medicare or Medicaid fraud does not exempt the action from the scope of the settlement agreement; the settlement agreement contemplates claims of any nature with no exclusions for particular causes of action. The only prerequisite is that, as relevant here, the claim arises out of the provision of MVA Related Health Care Services. Defendant's claims in the *Qui Tam* Action against Plaintiff fall within the scope of the Dismissal and Release Provisions.

### B. The Court Can Require "Necessary Steps" to Dismiss

Defendant's main argument is that, as a relator in a *Qui Tam* action, he is a "mere whistleblower" and "does not own those claims" because they are brought in the name of the government. (ECF No. 126, PageID.7140-41.) He maintains, depending on Sixth Circuit case law, that "the government is the real party in interest" under the FCA, and that "the harms redressed by the FCA belong to the government." (ECF No. 126,

PageID.7144 (quoting *United States v. Health Possibilities, P.S.C.*, 207 F.3d 335, 344 (6th Cir. 2000)).) Hence, Defendant argues that "a relator is without authority to unilaterally settle a qui tam suit because it would be 'akin to impermissibly bargaining away the rights of a third party.'" (*Id.*, PageID.7145 (quoting *Health Possibilities*, 207 F.3d at 341).) In Defendant's view, Plaintiff has failed "to provide any authority whatsoever that would explain how the Settlement Agreement could possibly serve to bar Angelo from acting on behalf of the Government to pursue claims belonging to the Government." (ECF No. 146, PageID.8034.)

As an initial matter, the court disagrees with Defendant that a relator possesses absolutely no interest in a *qui tam* action such that its claims may never be subject to a dismissal or release agreement. Other courts have rejected Defendant's position. *Radcliffe*, 600 F.3d at 328-289 ("Because Radcliffe possessed a presently enforceable claim at the time he signed the Release, the plain terms of the Release encompassed his FCA claims."); *United States ex rel. Class v. Bayada Home Health Care, Inc.*, No. CV 16-680, 2018 WL 4566157, at *6 (E.D. Pa. Sept. 24, 2018) (citing *Radcliffe*, 600 F.3d at 328). Even if the government is the "real party in interest," the Supreme Court has made clear that the FCA "gives the relator himself an interest in the *lawsuit*, and not merely the right to retain a fee out of the recovery," evinced in part by the fact that the statute permits a civil action "*for the person and for the United States Government*." *See Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 772 (2000) (citing 31 U.S.C. § 3730(b)); *see also Radcliffe*, 600 F.3d at 327-29 (disagreeing with party that a release agreement cannot be enforced simply because the "*qui tam* claims belong to the government, not the relator"). As Plaintiff notes, a relator is not a

11

passive witness once the whistle has been blown—the relator has "the right to conduct

the action." 31 U.S.C. § 3730(c)(3). In the present case, for example, it was not the

government that amended the complaint for itself; rather, it was Plaintiff as the relator

who made the changes and brought additional allegations.

Furthermore, Defendant argues that public policy weighs in favor of

nonenforcement of the settlement agreement. He claims that Congress, through the

FCA, has expressed a strong federal interest in encouraging private citizens to come

forward and inform the government of any uncovered fraud. (ECF No. 126,

PageID.7149-54.) And Defendant is correct to the extent that such an interest exists.

*See, e.g.*, *United States v. Northrop Corp.*, 59 F.3d 953, 967 (9th Cir. 1995) ("[T]he very

purpose of the Act's *qui tam* provisions is to create incentives for relators to supplement

government enforcement."); *United States ex rel. McNulty v. Reddy Ice Holdings*, Inc.,

835 F. Supp. 2d 341, 360 (E.D. Mich. 2011) ("Where the government has no knowledge

of the claims that form the basis for a *qui tam* complaint prior to the time that the relator

signs the release, enforcement of the release interferes with and frustrates the FCA's

goals of incentivizing individuals to reveal fraudulent conduct to the government.");

*Bayada Home Health Care*, 2018 WL 4566157, at *7 (quoting *United States ex rel. Hall

v. Teledyne Wah Chang Albany*, 104 F.3d 230, 233 (9th Cir. 1997)) (explaining that the

public policy recognized in *qui tam* cases is to "set up incentives to supplement

government enforcement" by "encouraging insiders privy to fraud on the government to

blow the whistle on the crime"). Certainly, one of the major overarching purposes of the

FCA's *qui tam* provisions is to incentivize citizens to bring fraud claims to the attention

of the government.

Consistent with this underlying policy interest, Defendant maintains that where a relator enters into a release of claims after the filing of a *qui tam* action, the release is unenforceable as to the pending *qui tam* claim. (ECF No. 126, PageID.7145.) Defendant cites several cases in support of this proposition. *See, e.g.*, *United States ex rel. Stipe v. Powell Cty. Fiscal Ct.*, No. 5:16-CV-446-KKC, 2018 WL 3078764, at *3 (E.D. Ky. June 21, 2018) ("It is undisputed that a post-filing release of *qui tam* claims is unenforceable."); *Bayada Home Health Care*, 2018 WL 4566157, at *4 ("It is well known that a relator may not enter into an enforceable settlement or release of *qui tam* claims after the filing of an FCA action."); *United States ex rel. Nowak v. Medtronic, Inc.*, 806 F. Supp. 2d 310, 336 (D. Mass. 2011) ("A relator may not enter into an enforceable settlement or release of *qui tam* claims after filing a False Claims Act action."); *McNulty*, 835 F. Supp. 2d at 358-59 (explaining that the FCA prohibits "a relator from entering into an enforceable settlement agreement or release of a *qui tam* claim after the filing of a FCA action"); *United States ex rel. Davis v. Lockheed Martin Corp.*, No. 4:09-CV-645-Y, 2010 WL 4607411, at *4 (N.D. Tex. Nov. 15, 2010) ("[B]ecause Davis signed the release after he filed the complaint and because this is a qui-tam action, the release cannot be enforced to dismiss Davis's action without the consent of the attorney general and this Court."). But each of the cases that Defendant cites add nothing more to what the plain language of the FCA already tells us. Indeed, in every case cited above, the courts rely on the same provision of the FCA, 31 U.S.C. § 3730(b)(1). Those courts held, in prohibiting a post-filing release agreement, that a party cannot *unilaterally* dismiss a *qui tam* action. In this regard, the plain language of the statute is clear: "The action may be dismissed only if the court and the Attorney General give written consent

to the dismissal and their reasons for consenting." 31 U.S.C. § 3730(b)(1). Accordingly, it is evident from the statute that if the government objects to the voluntary dismissal of a defendant, the relator is out of luck. This is true even where, as here, the government has already "affirmatively decline[d] to intervene in the action." *United States ex rel. Smith v. Lampers*, 69 F. App'x 719, 721-22 (6th Cir. 2003). The cases cited by Defendant merely restate that idea.[5]

Thus, while Defendant's position is adequately supported, that position is off-point. The key to resolving this matter is to keep in mind precisely what relief Plaintiff seeks; the difference appears minor, but one request would flout the plain language of the FCA, while the other would be consistent with it. Plaintiff does not request the court to order Defendant to voluntarily dismiss the *Qui Tam* Action against Plaintiff. As the statute makes clear, to accomplish a voluntary dismissal, the government's consent is required. Rather, Plaintiff maintains that Defendant must, pursuant to the settlement agreement, "take all steps necessary" to "secure the discontinuance of" the *Qui Tam* Action brought by Defendant. (ECF No. 118, PageID.6695; ECF No 118-2,

---

[5]     Even the Sixth Circuit's central holding in *Health Possibilities* serves to simply reiterate the plain language of the FCA and to clarify that the consent provision is not limited to the sixty-day intervention period: "Section 3730(b)(1) unqualifiedly provides that a qui tam action 'may be dismissed only if the court and Attorney General give written consent.' This language clearly does not limit the consent provision to the sixty-day intervention period. If Congress wanted to limit the consent requirement to the period before the United States makes its initial intervention decision, we presume that it knew the words to do so. . . . Accordingly, we conclude that the policies served by the veto power are entirely consistent with the conclusion compelled by § 3730(b)(1)'s plain meaning: that a relator may not settle any qui tam action without the Attorney General's consent." 207 F.3d at 339-41; *accord Lampers*, 69 F. App'x at 721 ("As we found in *Health Possibilities*, this language [of § 3730(b)(1)] means that a relator may not seek a voluntary dismissal of any *qui tam* action under the FCA without the government's consent.").

PageID.6704-05.) Plaintiff contends—and the court agrees—that taking "all necessary steps," in this context, amounts to simply asking the government for consent to dismiss Plaintiff from the *Qui Tam* Action. (ECF No. 118, PageID.6695-96; ECF No. 130, PageID.7334.)

Plaintiff has presented no authority standing for the notion that a court lacks the ability to require a party merely to *seek* the government for consent to end an FCA claim, and the court finds a dearth of caselaw on this precise question. Yet, nothing in either the text of the FCA or FCA caselaw prohibits district courts from dismissing *qui tam* claims against a given party once the government has consented to it. *See, e.g.*, *United States v. HCA, Inc.*, No. 1:08-CV-71, 2012 WL 5997952, at *1 (E.D. Tenn. 2012) (describing a voluntary dismissal that was agreed upon by the government, and the relator). As some courts have recognized, "the government's power to block settlements does not mean that the relator will never be the person settling the claim," which means that a relator may still settle a claim on the government's behalf once consent is acquired. *See Searcy v. Philips Elecs. N. Am. Corp.*, 117 F.3d 154, 160 (5th Cir. 1997); *accord United States ex rel. Michaels v. Agape Senior Cmty., Inc.*, 848 F.3d 330, 338-39 (4th Cir. 2017). Thus, the court finds that it has the authority to require Defendant to take "all steps necessary" to dismiss the *Qui Tam* Action—here, in context and under the language of the Dismissal and Release Provisions, that means Defendant must at least *request the government's consent* to dismiss the claims against Plaintiff and its "subsidiaries, affiliates, officers, directors, and employees." (ECF No.118-2, PageID.6702.) If, upon request, the government decides it does not consent to

dismissal, then that is the end of the matter. *See Health Possibilities*, 207 F.3d at 339-41. The court lacks authority under the FCA to mandate anything further.

This is a narrow holding that does not conflict with the underlying public policies of the FCA. Defendant argues that the FCA's goals would be frustrated by enforcement of the agreement, and it is well-established that "a promise is unenforceable if the interest in its enforcement is outweighed in the circumstances by a public policy harmed by enforcement of the agreement." *Town of Newton v. Rumery*, 480 U.S. 386, 392 (1987). Defendant relies in part on *McNulty*, which recognized in a pre-filing release case that "[w]here the government has no knowledge of the claims that form the basis for a *qui tam* complaint prior to the time that the relator signs the release, enforcement of the release interferes with and frustrates the FCA's goals of incentivizing individuals to reveal fraudulent conduct to the government." 835 F. Supp. 2d at 360. The *McNulty* court declined to enforce a release agreement because at the time the release was signed, "McNulty had not yet approached the government about the . . . scheme (let alone about any suspected fraud on the government)." *Id.* Here, by contrast, it is undisputed that Defendant approached the government and informed it of potential fraud involving Plaintiff in July 2019, giving the government a significant period of time to fully investigate Plaintiff's claims; the parties entered into a settlement agreement a year and a half later in February 2021. (ECF No. 118, PageID.6680; ECF No. 118-2; ECF No. 118-3.) The settlement agreement does not frustrate the incentive of individuals to reveal fraudulent conduct to the government considering Plaintiff had already done so. Nor does this particular settlement agreement encourage guilty individuals to "insulate themselves from the reach of the FCA by simply forcing potential

relators to sign general agreements invoking release and indemnification from future suit." *United States ex rel. Longhi v. United States*, 575 F.3d 458, 474 (5th Cir. 2009). This particular agreement's scope is limited to claims that could have been raised in this litigation or MVA Related Health Care Services and thus does not constitute a "general release" of claims. But more importantly, it still comports with the plain language of the FCA: Defendant can be dismissed from the *Qui Tam* Action only if the government consents. *See In re Pharm. Indus. Average Wholesale Price Litig.*, No. 08-11200-PBS, 2012 WL 366599, at *4 (D. Mass. Jan. 26, 2012) (recognizing that the FCA's plain language under § 3730(b)(1) protects against overly broad releases of claims by allowing the government to withhold consent from dismissal of claims). Merely requiring Plaintiff to ask the government's consent to dismiss the action is not contrary to the FCA as the government still has the final word on whether the relator must continue to prosecute the action on the government's behalf.[6]

### III. CONCLUSION

The FCA makes clear that the court could not enforce the settlement agreement by mandating dismissal of Plaintiff from the *Qui Tam* Action. *Health Possibilities*, 207 F.3d at 339-41; *Lampers*, 69 F. App'x at 721-22. However, the FCA's text and purpose is not offended by requiring Defendant, in accordance with the settlement agreement, "to take all necessary steps . . . to secure the discontinuance of" the *Qui Tam* Action

---

[6]     Plaintiff argues in passing that if the government does not consent to dismissal of the claims against it, Defendant must indemnify Plaintiff for its costs and liabilities resulting from the *Qui Tam* Action, as required by settlement agreement. (ECF No. 118, PageID.6696.) At this juncture, the parties do "not know whether the government would agree to dismissal of the *Qui Tam* Lawsuit because [Defendant] . . . has not asked." (ECF No. 130, PageID.7334.) The indemnity issue is therefore premature. Plaintiff may seek to raise that issue by motion at the proper time.

brought by Defendant. The court's narrow holding is only that, consistent with the FCA,

Defendant must request the federal government's consent to dismiss Plaintiff.

Accordingly,

IT IS ORDERED that Plaintiff's "Motion to Enforce Settlement Agreement" (ECF

No. 118) is GRANTED. Accordingly,

IT IS ORDERED that Defendant, proceeding in good faith and undertaking no

contrary or inconsistent acts, must forthwith solicit the government's consent to dismiss

the instant *Qui Tam* Action against Plaintiff, along with its subsidiaries, affiliates,

officers, directors, and employees, and must act on this obligation not later than

**Monday, March 14, 2022.**


                                        s/Robert H. Cleland
                                        ROBERT H. CLELAND
                                        UNITED STATES DISTRICT JUDGE

Dated:  February 28, 2022

I hereby certify that a copy of the foregoing document was mailed to counsel of record
on this date, February 28, 2022, by electronic and/or ordinary mail.

                                        s/Lisa G. Wagner
                                        Case Manager and Deputy Clerk
                                        (810) 292-6522


S:\Cleland\Cleland\JUDGE'S DESK\C2 ORDERS\19-10669.ANGELO.MotionToEnforceSettlementAgreement.MAZ.docx.RHC.docx